ORIGINAL

FILED
SEP 2 1 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

BARUCH VEGA,

Plaintiff,

CASE NO. 07-685 C

v.

THE UNITED STATES,

Defendant.

______________________________/

## COMPLAINT

For this Complaint, the Plaintiff, BARUCH VEGA ("Mr. Vega") states:

## PARTIES

1. Mr. Vega is a resident of Miami-Dade County, Florida and is a lawful, permanent, resident of the Untied States of America.
2. The Defendant is the Untied States of America and is a proper defendant pursuant to Title 19 USC §1691.

## COURT'S JURISDICTION AND UNDERLYING STATUTE THAT MANDATES PAYMENT OF MONEY

3. This action is brought pursuant to Title 19 U.S.C. §1619 – for an award of compensation to an informer.
4. This Court has jurisdiction pursuant to the Tucker Act, 28 U.S.C. §1491 (1994) and *John Doe v. The United States*, 100 F.3d 1576 (Fed. Cir.1996).

## FACTS UPON WHICH CLAIMS ARE BASED

5. In or about 1996 and 1997, the Plaintiff became a documented confidential informant for the Untied States of America, specifically, for two federal law enforcement agencies, the Federal Bureau of Investigation ("FBI") and later, for the Drug Enforcement Administration ("DEA"), within the meaning of Title 19 U.S.C. §1619 .

6. Mr. Vega was not a traditional informant and his methodology was anything but parochial. Mr. Vega engineered a plan/program that proved to be innovative and very successful.

7. Mr. Vega would play and later, in fact did play, the role of an intermediary (or broker) between Colombian drug traffickers, some then unknown (and thus, unidentified) to U.S. law enforcement, others already identified (by their real names or nicknames as "suspects") by U.S. law enforcement and, others already indicted[1], for drug trafficking and/or money laundering charges in various federal districts across the United States of America.

8. At great danger to himself, Mr. Vega approached several Colombian targets in Colombia, South America, and attempted to convince them that it would be better for them to (anticipatorily) negotiate their criminal exposure with the United States of America rather than wait until an investigation and/or an indictment and/or an arrest and/or an extradition to the United States might result against them. Many of these targets welcomed the suggestion and decided to proceed with this plan/program.

9. Mr. Vega educated the Colombian targets on their criminal exposure by connecting them with various experienced American federal criminal defense lawyers, one being a former federal prosecutor. All of these lawyers were based out of Miami, Florida.

10. Naturally, it made sense for the Colombian targets to listen to Mr. Vega and the American lawyers, and, if then interested in proceeding with the plan/program, to have legal representation secured before embarking on this plan/program. The Colombian targets needed legal counsel to "navigate" them through the federal criminal justice system. If the Colombian targets ultimately negotiated a deal, they would need such

[1] Hereinafter referred to collectively as "the Colombian targets".

lawyers to handle the entire gammit of: initial appearance, bond, plea colloquy, presentence investigation report, and sentencing.

11. Once Mr. Vega introduced the American lawyers to the Colombian targets, the lawyers would then get retained and then take over as legal representatives for the Colombian targets and further deal with a group of United States law enforcement agents and prosecutors, hand-picked to work out deals for the Colombian targets.

12. A particular United States Attorney for the Southern District of Florida became the coordinator of this "recruiting effort".

13. Generally speaking, the plan/program required the Colombian targets to meet with FBI and/or DEA agents in Panama. The purpose of the initial part of the meeting was for introductions to be made between the Colombian targets (and their lawyers) on one side and the federal agents on the other side. Subsequently, the meetings took the form of debriefings, all with a view towards negotiating plea agreements between the targets and the United States of America. There were many of these types of meetings in Panama over a period of several years.

14. Several FBI and DEA agents were involved in this plan/program which grew exponentially over the years.

15. As indicated, some of these Colombian targets were not even under investigation at the time. Some were under investigation in various (early, mid-range, or advanced) stages. Others were already under indictment in the United States. Depending on the then legal status of each Colombian target and the level of his or her "cooperation" with U.S. law enforcement[2] each Colombian target would reach a "sweetheart deal" (in varying degrees

[2] Grand jury testimony, trial testimony, voluntary forfeitures, the recruitment" of other Colombian targets, etc.

of course) and then receive, in some instances, an "S" Visa - to prevent his/her/their deportation back to his/her/their home country – Colombia.

16. The plan/program was extremely successful. All in all, Mr. Vega convinced and successfully recruited about 114 Colombian targets to enter into this plan/program, about 25 of which were fugitives at the time of negotiating the deals.

17. Within the past seven years alone, there were 35 such Colombian targets who reached deals with the United States. A list identifying these individuals is attached hereto as Exhibit A.

18. The economic (and non-economic) benefits to the United States in bringing all of these Colombian targets to justice is mind boggling. The United States obtained over a hundred federal drug convictions. Much of the cooperation of the Colombian targets itself resulted in other investigations, prosecutions and convictions – something akin to a "domino effect". In varying degrees, these targets[3] forfeited cash, real estate, jewelry and art in an estimated total amount somewhere between $250 million and $500 million.

19. Title 19 U.S.C. §1619 entitles the Plaintiff to an award of 25% of the appraised value of any forfeited property, per case, with a $250,000.00 limitation per case.

20. Accordingly, Mr. Vega seeks a $250,000.00 payment for each of the 114 cases he has made for the United States and therefore, seeks a total sum $28,500,000.00.

WHEREFORE, Mr. Vega seeks judgment against the United States of America for $28,500,000.00, plus any and all relief this Court deems just and proper.

[3] And later, the "victims" of those targets.

Dated this ____day of September, 2007.

RICHARD J. DIAZ, P.A.
3127 Ponce de León Blvd.
Coral Gables, FL 33134
Telephone: (305) 444-7181
Facsimile: (305) 444-8178

By: ______________________
Richard J. Diaz, Esquire
(Florida Bar No: 0767697)

**List of Drug traffickers surrendered and cooperating sources recruited between, 1997 to 2000**

**FBI**
1. Arturo Piza
2. Oscar Grisales
3. Julio Fierro
4. John Castro (Jimmy Aloja "Mijares")
5. Jairo
6. Luz Stella Ossa
7. Armando Ballestas

**DEA**
1. Hernán Arboleda
2. Gustavo Gallego
3. Nelly Gallego
4. Attorney Enrique Mancera
5. Jose Guillermo Gallón
6. Pedro Gallón
7. Nicolás Bergonzoli
8. Orlando Sanchez-Cristancho
9. Milton Perlaza aka "Javier Valencia" aka "Pele"-for Jorge Eliécer Asprilla Perea
10. Carlos Ramon-Zapata
11. Oscar Campuzano
12. Gustavo Usuga
13. Juan Gabriel Usuga
14. Bernardo Sanchez-Noreña
15. Maria Elena Londoño for Héctor Mario Londoño-Vasquez "Negro Yuca"
16. Jorge Orrego for Yvonne Maria Scaff de Saldarriaga
17. The Tascón sisters for Alfredo Tascón-Aguirre
18. Bernal's wife for Alejandro Bernal-Madrigal "Juvenal"
19. Attorney Roberto Uribe

EXHIBIT A